United States District Court
Middle District of Florida
Jacksonville Division

**KRISTIN LAUREL CONWAY,**

     *Plaintiff,*

v.                                                    **NO. 3:22-cv-478-MMH-PDB**

**ACTING COMMISSIONER OF SOCIAL
SECURITY,**

     *Defendant.*

_____

# Report and Recommendation

Kristin Conway challenges a final decision of the Acting Commissioner of Social Security denying her application for disability-insurance benefits. Doc. 1. The decision is by an administrative law judge (ALJ). Tr. 12–28. The Acting Commissioner has filed a 1,013-page record, Doc. 8 (Tr. 1–1,013), and each side has filed a brief, Docs. 11, 14.

Conway argues reversal is required for three reasons. First, she argues reversal is required because the ALJ failed to apply the correct legal standards when finding she possesses skills from her former job that can be transferred to other jobs. Doc. 11 at 6–17. Second, she argues reversal is required because the ALJ failed to evaluate a functional limitation. *Id.* at 17–22. Third, she argues reversal is required because the ALJ and the Appeals Council members were not properly appointed. *Id.* at 22–24. The Acting Commissioner argues there is no error. Doc. 14.

## I.    Background

Conway was born in 1964. Tr. 35, 146, 189. She worked as a nurse and a nurse supervisor, Tr. 21, 59–61, 201, before ceasing work on August 1, 2018, Tr. 17, 43.

Conway applied for benefits on March 19, 2019, Tr. 160, alleging she had become disabled from spondylolisthesis and post 4 level fusion surgery, Tr. 68, 200. Her date last insured is December 31, 2023. Tr. 66, 189.

Conway proceeded through the administrative process, failing at each level. Tr. 1–6, 12–28, 66–78, 79–94. This action followed. Doc. 1.

## II.    ALJ Hearing and Decision

The ALJ conducted an evidentiary hearing. Tr. 29–65. Conway was represented by a non-attorney representative. Tr. 15, 31, 33. Conway and a vocational expert testified. Tr. 35–64. After the hearing, the vocational expert supplemented her testimony with answers to interrogatories. Tr. 257–79.

In the decision under review, the ALJ proceeded through the five-step sequential process.[1] Tr. 17–24.

---

[1]To decide whether a person is disabled, the Social Security Administration uses a five-step sequential process. 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ asks whether the claimant is engaged in "substantial gainful activity." *Id.* At step two, the ALJ asks whether the claimant has a severe impairment or combination of impairments. *Id.* At step three, the ALJ asks whether the claimant has an impairment or combination of impairments meeting or medically equaling the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* At step four, the ALJ asks whether the claimant can perform any of her "past relevant work" considering her residual functional capacity (RFC). *Id.* And at step five, the ALJ asks whether the claimant can adjust to other work considering her RFC, age, education, and work

At step one, the ALJ found Conway has not engaged in substantial gainful activity since August 1, 2018 (the alleged onset date). Tr. 17–18.

At step two, the ALJ found Conway has severe impairments of "degenerative disc disease, status-post L3 – L4 micro-discectomy and L3 – L5 transforaminal lumbar interbody fusion (TLIF); lumbar radiculopathy and facet arthropathy, lumbar post-laminectomy syndrome; chronic pain syndrome; and neuropathy[.]" Tr. 18.

At step three, the ALJ found Conway has no impairment or combination of impairments that meets or medically equals the severity of any impairment in the regulatory listings, 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 18.

The ALJ found Conway has this residual functional capacity (RFC):

> [Conway can] perform sedentary work … except never climbing ladders, ropes, or scaffolds; never operating foot controls with the left foot; never kneeling, crouching, or crawling. Occasionally operating foot controls with the right foot, climbing stairs and ramps, balancing, and stooping. [She] can never work at unprotected heights, around dangerous unprotected moving mechanical parts, around pulmonary irritants such as concentrated amounts of dusts, noxious odors, fumes, mists, gases, seasonal allergens, and poorly ventilated work spaces, in extreme cold or extreme heat, or with vibration. She can occasionally operate a motor vehicle. Additionally, [she] needs the opportunity to stand for three to four minutes after every 55 minutes of sitting.

Tr. 19.

To explain the RFC finding, the ALJ summarized Conway's testimony:

> [Conway] testified that she suffers from back pain; however, she could drive, shop, attend church and school sporting events, dress, take care

experience. *Id.* If the ALJ finds disability or no disability at a step, the ALJ will "not go on to the next step." *Id.*

of her personal needs, cook, perform household chores, read[], handle finances, exercise, and travel. She stated that she went to New Orleans, took a European cruise to the Baltic Sea, and spent time boat riding on a lake. She reported the ability to lift up to 15 pounds. Medication, change of positions, ice, and heat relieves her back pain.

Tr. 19.

The ALJ discussed Conway's treatment for conditions causing low-back pain, Tr. 19–20, and records from treatment providers:

On August 6, 2018, Dr. [Seth] Molloy completed a Medical Request Form. He reported [Conway's] diagnosis of lumbar herniated disc, which occurred on April 29, 2018, caused severe lower extremity pain and paresthesia[] and required surgical intervention, which caused [her] to be unable to work on a daily basis, until medically cleared. Dr. Molloy also stated [she] was unable to bend and/or twist at the waist and [should] no[t] lift more than three pounds. [Her] projected return to work date was tentatively set for September 18, 2018.

Claudia Morse, LPN with Palmetto Health Neurosurgery Associates, stated on September 25, 2018, that [Conway] would remain out of work until her next appointment with Dr. Molloy on October 3, 2018, after which she could return to work on October 10, 2018. At the office visit of October 3, 2018, [she] reported no relief and said that her low back pain radiated into both legs with numbness in the right. The physical examination revealed normal range of motion and strength in her musculoskeletal system, and she walked with a normal gait. Drew K. Friedrichs, MMS, PA-C, recommended that she undergo MRI and CT scans of her lower back. It was his opinion that [she] not return to work until after receipt of the radiological reports, as her job is very physically demanding. Dr. Molloy stated on December 10, 2018, that [Conway] had undergone an endoscopic micro-discectomy on August 21, 2018, with only slight improvement, and had [begun] having recurrent, severe low back pain with radiation into her legs, making prolonged standing difficult. He ascribed limitations of no bending, twisting at the waist, or lifting more than five pounds.

On December 28, 2018, [Conway] was admitted to Prisma Health Richland Hospital for severe lumbar spondylosis with a grade 2 spondylolisthesis at L5 – S1. She underwent posterior lateral arthrodesis at L2, L3, L4, L5 and S1, cages placed at L3 – L4, L4 – L5, L3 with pelvic screw, and bilateral decompressive laminectomies,

4

facetectomies, and foraminotomies at L3 – L4, L4 – L5, and L5 – S1 by Dr. Seth Molloy. [She] was discharged on January 2, 2019[.]

Subsequently, on January 21, 2019, Dr. Molloy completed an additional Medical Request Form indicating that [Conway's] lumbar fusion was due to a work-related incident on April 29, 2018. He stated that [she] was healing from extensive spine surgery and was unable to drive, bend or twist at the waist, or lift more than five pounds. It was his opinion that [she] would be able to return to work, without restrictions, on or about March 25, 2019.

Tr. 20 (internal citations omitted).

The ALJ described Conway's improvement after the lumbar surgery:

On January 23, 2019, [Conway] returned to see Dr. Friedrichs. She reported minimal back pain. She was wearing a back brace, using a cane, and walking on a daily basis. [She] had normal range of motion, strength, and mobility/gait.

On April 18, 2019, [Conway] reported that she had stopped wearing the [thoracic lumbar sacral orthosis] brace the prior Wednesday, and had difficulty with activities of daily living, lower body dressing, and crossing over a baby gate. She used a bone stimulator on a daily basis for two hours for the first year after her surgery. [She] further stated that she ambulated with an assistive device for long distances and while in crowds. [She] continued to have some low back pain, but it was more of a bilateral sacroiliac joint pain and lower extremity numbness. She did not have any new symptoms after her lumbar fusion. On April 25, 2019, she rated her pain as a 2/10. As of July 20, 2019, [she] was able to walk one mile, dress, complete yard work and housework, play with her puppy, get on and off the floor, and help her husband build a pergola.

On May 22, 2019, five months status-post lumbar pelvic fixation, [Conway] reported to Dr. Molloy she was doing well, and her lower extremity strength testing showed no major deficits. Records from Palmetto Pain Management show that [she] reported 30+ years of lower back pain. She was assessed with chronic pain syndrome, for which she was prescribed Robaxin and Cymbalta. [She] informed the clinic she was leaving on a 12-day cruise on August 7, 2019.

Physical therapy records from Drayer Physical Therapy show that on June 21, 2019, [Conway] reported a pain level of 4/10, and increased left

5

leg pain with feelings of instability. Examination showed that [she] stood with decreased weight bearing and sensation on left, lower extremity. [She] appeared motivated and able to perform exercises. [Her] progress towards goals and tolerance to treatment was reported as good. She had improved eccentric control with sit and stand, and well as core control with glut[e] kickbacks. [She] was placed on limitations of no lifting more than 20 pounds or twisting. These records indicate a decrease in [her] pain as she was able to perform such chores as vacuuming, attending a gym, and walking in the neighborhood.

Tr. 21 (internal citations omitted).

The ALJ described a report analyzing Conway's occupational skills:

A Transferable Skills Analysis report dated September 18, 2019, showed that [Conway's] work experience was that of a general duty nurse,[2] Dictionary of Occupational Titles (DOT) #075.364-010 and was skilled/medium work. [Her] lifting restrictions was shown as lifting no more than 20 pounds and no twisting. [Her] skills and abilities included applying technical knowledge, common sense, and special medical skills to care for or treat sick/handicapped people; using her eyes, hands, and fingers skillfully; adapting quickly to emergency situations; instructing, planning, and directing work of others; and keeping accurate records. [Her] skills would transfer to the job of nurse case manager,

---

[2]The Dictionary of Occupational Titles describes a general duty nurse as follows:

Provides general nursing care to patients in hospital, nursing home, infirmary, or similar health care facility: Administers prescribed medications and treatments in accordance with approved nursing techniques. Prepares equipment and aids physician during treatments and examinations of patients. Observes patient, records significant conditions and reactions, and notifies supervisor or physician of patient's condition and reaction to drugs, treatments, and significant incidents. Takes temperature, pulse, blood pressure, and other vital signs to detect deviations from normal and assess condition of patient. May rotate among various clinical services of institution, such as obstetrics, surgery, orthopedics, outpatient and admitting, pediatrics, and psychiatry. May prepare rooms, sterile instruments, equipment and supplies, and hand items to SURGEON (medical ser.) 070.101-094; OBSTETRICIAN (medical ser.) 070.101-054, or other medical practitioner. May make beds, bathe, and feed patients. May serve as leader for group of personnel rendering nursing care to number of patients.

DOT # 075.364-010 (Nurse, General Duty), 1991 WL 646751.

skilled/sedentary   and   utilization   review   coordinator,   also
skilled/sedentary work.

Tr. 21 (internal citations omitted).

The ALJ considered evidence from a later examination:

On June 24, 2020, [Conway] saw Dr. Jenifer Stanislaus at Palmetto Pain
Management. She informed the doctor that she was going to
Jacksonville for a week. Her pain medications were helpful, she denied
any adverse side effects, and she rated her pain as a 6/10. Review of
systems was negative and the physical examinations revealed that [she]
was alert, oriented, and in no acute distress. Her cervical spine, upper
extremities, and thoracic spine showed full range of motion, but her
lumbar spine showed somewhat limited range due to pain. She had
positive flexion, extension, and rotation. [Her] lower extremities showed
equal and bilateral strength with normal range of motion. Her
medications included Pregabalin, Tramadol, Methocarbamal, and
Medrol for her chronic pain syndrome.

Tr. 22 (internal citation omitted).

The ALJ evaluated a treatment provider's opinion:

I have fully considered the medical opinions and prior administrative
medical findings as follows: the opinions regarding time to return to
work [by Dr. Molloy, Tr. 639–929,] are persuasive; however, pertained
to the periods after surgery and[,] therefore, were temporary.

Tr. 22 (internal citation omitted).

The ALJ found unpersuasive state agency physicians' opinions finding

Conway less limited than how the ALJ had assessed the RFC:

I have considered the administrative findings of fact made by the State
agency physicians that the claimant is capable of light work with
additional limitations of no climbing ladders, ropes, or scaffolds;
occasionally climbing ramps and stairs, balancing, stooping, kneeling,
crouching, and crawling; and avoiding extreme cold and heat, dangerous
machinery, unprotected heights and vibration. Their opinions must be

evaluated as those of non-examining experts. The State consultants' conclusions are found non-persuasive because evidence received at the hearing level shows that the claimant is more limited than determined by the State agency consultants.

Tr. 22 (internal citation omitted).

At step four, the ALJ identified Conway's past relevant work as a "general duty nurse, skilled and medium but very heavy as performed, DOT # 075.364-010" and as a "nurse supervisor, skilled and light but performed at the heavy level, DOT # 075.167.010." Tr. 22. The ALJ found that because Conway was limited to sedentary work, she cannot perform her past relevant work. Tr. 22.

The ALJ described Conway's skills from past relevant work:

> The vocational expert testified that [Conway's] past relevant work as a general duty nurse was skilled with a specific vocational preparation (SVP) code of 7 and required the following skills: active listening, social perceptiveness, service orientation, critical thinking, coordination, reading comprehension, writing, instruction, time management, documenting and recording information, learning strategies, processing information, general hospital and medical knowledge, knowledge of general nursing procedures and requirements, and judgment and decision making.

Tr. 23.

At step five, the ALJ relied on the vocational expert's testimony and found Conway can perform work as a "hospital admitting clerk," "nurse consultant,"[3] or "tumor registrar." Tr. 23 (capitalization omitted). She further found those jobs exist in significant numbers in the national economy. Tr. 23.

---

[3]The Dictionary of Occupational Titles describes a nurse consultant as follows:

The ALJ summarized the vocational expert's testimony:

> The vocational expert was asked if any occupations exist which could be performed by an individual with the same age, education, past relevant work experience, and residual functional capacity as [Conway], and which require skills acquired in [her] past relevant work but no additional skills. The vocational expert responded that representative occupations such an individual could perform include: Hospital admitting clerk …; Nurse consultant …; and Tumor registrar ….

Tr. 23.

The ALJ found the vocational expert's testimony was consistent with the DOT, adding:

> Based on the testimony of the vocational expert, I conclude that [Conway] has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy. The vocational expert testified that [Conway's] previous work is so similar to the jobs recited above that [she] would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry.

Tr. 23–24.

---

Advises hospitals, schools of nursing, industrial organizations, and public health groups on problems related to nursing activities and health services: Reviews and suggests changes in nursing organization and administrative procedures. Analyzes nursing techniques and recommends modifications. Aids schools in planning nursing curriculums, and hospitals and public health nursing services in developing and carrying out staff education programs. Provides assistance in developing guides and manuals for specific aspects of nursing services. Prepares educational materials and assists in planning and developing health and educational programs for industrial and community groups. Advises in services available through community resources. Consults with nursing groups concerning professional and educational problems. Prepares or furnishes data for articles and lectures. Participates in surveys and research studies.

DOT # 075.127-014 (Nurse, Consultant), 1991 WL 646741.

9

The ALJ thus found no disability. Tr. 24.

## III.   Standard of Review

The first and second arguments are governed by the following standards.

A court's review of the Acting Commissioner's decision is limited to whether substantial evidence supports the factual findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoted authority omitted). The "threshold for such evidentiary sufficiency is not high." *Id.* Under this standard of review, a court may not reweigh the evidence or substitute its judgment for that of the Acting Commissioner. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

The third argument presents a question of statutory interpretation and thus a question of law.

A social-security claimant may challenge whether the ALJ or Appeals Council was properly appointed, even if the claimant raises the challenge for the first time in federal court. *Carr v. Saul*, 141 S. Ct. 1352, 1362 (2021).

## IV.   Law and Analysis

The ALJ's decision is supported by substantial evidence. The evidence includes medical records showing Conway's injuries improved with treatment and her more severe limitations were temporary; medical records showing she mostly had a normal range of motion, strength, mobility, and gait; her reports

that her pain was low or minimal and was relieved by medication, changing positions, ice, and heat; her hearing testimony that she could drive, shop, attend church and school sporting events, dress, take care of her personal needs, cook, perform household chores, read, handle finances, exercise, lift up to 15 pounds, ride a boat, and travel and that she could go on multiple vacations after the alleged onset date; her reports that she could walk a mile, complete yard- and housework, play with her puppy, get on and off the floor, and help her husband build a pergola; and the vocational expert's testimony that her skills were transferable to other jobs.

Conway's three arguments, analyzed in the order she presents them, are unpersuasive.

## A.   *Transferability of Skills*

Conway argues reversal is required because the ALJ failed to apply the correct legal standards when finding she possesses skills from her former jobs that can be transferred to other jobs. Doc. 11 at 6–17.

If a claimant cannot perform her past relevant work, the Social Security Administration (SSA) proceeds to step five of the five-step sequential process described in footnote 1 above. 20 C.F.R. § 404.1520(a)(4). At that step, the SSA assesses the RFC and the claimant's age, education, and work experience to determine if the claimant can adjust to other work. *Id.* at § 404.1520(a)(4)(v). If the claimant can adjust to other work, the SSA will find the claimant not disabled; if the claimant cannot adjust to other work, the SSA will find the claimant disabled. *Id.*

"A skill is knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level (requires more than 30 days to learn)." Social Security Ruling (SSR) 82-41.2.a, 1982 WL 31389, at *2. "It is practical and familiar knowledge of the principles and processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner." *Id.*

When making a step-five finding, the SSA will find a claimant has skills that can be used in other jobs "when the skilled or semi-skilled work activities [the claimant] did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work." 20 C.F.R. § 404.1568(d)(1).

This transferability of skills "depends largely on the similarity of occupationally significant work activities among different jobs." *Id.* "Transferability is most probable and meaningful among jobs in which—(i) The same or a lesser degree of skill is required; (ii) The same or similar tools and machines are used; and (iii) The same or similar raw materials, products, processes, or services are involved." *Id.* § 404.1568(d)(2)(i)–(iii); *accord* SSR 82-41, 1982 WL 31389, at *5.

"There are degrees of transferability of skills ranging from very close similarities to remote and incidental similarities among jobs." 20 C.F.R. § 404.1568(d)(3). "A complete similarity of all three factors is not necessary for transferability." *Id.* Nevertheless, "when skills are so specialized or have been acquired in such an isolated vocational setting (like many jobs in mining, agriculture, or fishing) that they are not readily usable in other industries, jobs, and work settings, [the SSA] consider[s] that they are not transferable."

*Id.* "Generally, the greater the degree of acquired work skills, the less difficulty an individual will experience in transferring skills to other jobs except when the skills are such that they are not readily usable in other industries, jobs and work settings." SSR 82-41, 1982 WL 31389, at *5.

Special rules for transferability of skills apply for a claimant of "advanced age" (55 or older, 20 C.F.R. § 404.1563(e)). 20 C.F.R. § 404.1568(d)(4). For an advanced-age claimant limited to sedentary work, as here, the SSA will find that the claimant "cannot make an adjustment to other work unless" she has skills she "can transfer to other skilled or semiskilled work" she can do despite her impairments. *Id.* Her skills will be found transferable "only if the sedentary work is so similar to [her] previous work that [she] would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry." *Id.*

For a step-five finding, an ALJ may rely on a vocational expert's testimony. *Phillips v. Barnhart*, 357 F.3d 1232, 1239–40 (11th Cir. 2004), *superseded on other grounds by* 20 C.F.R. § 404.1520c.

Here, the ALJ found Conway is of advanced age, Tr. 22, a finding neither side contests.[4] The ALJ found Conway has the RFC to do sedentary work with additional limitations. Tr. 19. Relying on the vocational expert's testimony, the ALJ found Conway has past relevant work, including as a general duty nurse. Tr. 23. Relying on the vocational expert's testimony, the ALJ found Conway had acquired work skills from her past relevant work; specifically, "active listening, social perceptiveness, service orientation, critical thinking,

---

[4]Born in February 1964, Conway was 54 on the alleged onset date in August 2018, and 57 on the decision date in July 2021. Tr. 24, 35, 146, 189.

coordination, reading comprehension, writing, instruction, time management, documenting and recording information, learning strategies, processing information, general hospital and medical knowledge, knowledge of general nursing procedures and requirements, and judgment and decision making." Tr. 23. Relying on the vocational expert's testimony, the ALJ found those skills are transferable to jobs that include the job of nurse consultant.[5] Tr. 23. Relying on the vocational expert's testimony, the ALJ found Conway's previous work is so similar to that job and two other jobs that Conway "would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry." Tr. 23–24.

Contrary to Conway's argument, the ALJ applied the correct legal standards, and the vocational expert's testimony amounts to substantial evidence to support the findings. *See Solomon v. Comm'r of Soc. Sec. Admin.*, 376 F. Supp. 3d 1012, 1019 (D. Ariz. 2019) ("The ALJ's transferability determination was supported by the vocational expert's testimony, which is itself substantial evidence sufficient to uphold the ALJ's decision.").

Conway contends the ALJ's decision "is entirely silent as to the ease of transferability" of her skills and "was instead limited to whether the occupations she relied upon required additional skills." Doc. 11 at 9 (emphasis and internal quotation marks omitted). To the contrary, as the Acting Commissioner observes, *see* Doc. 14 at 16, the ALJ explicitly discussed ease of transferability. *See* Tr. 23–24 ("The vocational expert testified that the

---

[5]The ALJ found Conway can perform work as a "hospital admitting clerk," "nurse consultant," or "tumor registrar" and that those jobs exist in significant numbers in the national economy. Tr. 23 (capitalization omitted). A finding regarding any one of those jobs suffices. In the interest of judicial economy, the undersigned analyzes just one of the jobs—nurse consultant.

claimant's previous work is so similar to the jobs recited above that the claimant would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry.").

Conway relies on Materials, Productions, Subject Matter, and Services (MPSMS) and Work Field (WF) codes to argue the skills from her past relevant work, including general duty nurse, are not transferable to the jobs the ALJ identified, including nurse consultant. Doc. 11 at 10–13.

"MPSMS is the final link in a chain describing (1) what the worker does (Worker Functions); (2) what gets done (Work Fields); (3) to what[.]" *The Revised Handbook for Analyzing Jobs*, U.S. Department of Labor, Employment and Training Administration, ch. 5, p. 5-1 (1991). Work fields "are categories of technologies that reflect how work gets done and what gets done as a result of the work activities of a job: the purpose of a job." *Id.* ch. 4, p. 4-1. Conway observes that general duty nurse and nurse consultant share MPSMS code 924 ("Health Caring—Medical") but general duty nurse has a WF code 294 ("Nursing, Dietetic, and Therapeutic Services") while nurse consultant has an additional MPSMS code of 926 ("Medical Assistant, Aide, and Attendant Services") and a WF code of 282 ("Information Giving").[6]

---

[6]Incidentally, the jobs of general duty nurse and nurse consultant share other codes or characteristics. The MPSMS codes for both jobs are under 920 ("Medical and other Health Services"). *The Revised Handbook*, ch. 5, p. 5-4. Both jobs are under Area 10 ("Humanitarian Occupations"), under 10.02 ("Nursing, Therapy, and Specialized Teaching"), under 10.02.01 ("Nursing"), and under 075 ("Registered nurses"), and have a "specific vocational preparation" of 7, a reasoning level of 5, a math level of 4, a language level of 5, and MPSMS code 924 ("Health Caring—Medical"). *Compare* DOT # 075.364-010 (Nurse, General Duty), 1991 WL 646751, *with* DOT # 075.127-014 (Nurse, Consultant), 1991 WL 646741.

15

The Program Operations Manual System (POMS)[7] details how to assess transferability of skills and includes in step four of eight the direction to "Search for occupations related to the claimant's PRW using the same or similar: guide for occupational exploration (GOE) code; … MPSMS … code; … WF … code; occupation group (first three digits of DOT code); or "industry designation." POMS DI 25015.017 § I. POMS lists various factors to consider, including "types of tasks, materials, production, processes or services; types of tools or machines used; composite jobs; degree of judgment required beyond carrying out simple duties; work-setting or industry, or both; and the claimant's description of PRW (as opposed to the DOT description)." *Id.* § J(1)(b).

Conway's argument is unpersuasive. As stated, the regulations explain that "[t]ransferability is most probable and meaningful among jobs in which— (i) The same or a lesser degree of skill is required; (ii) The same or similar tools and machines are used; and (iii) The same or similar raw materials, products, processes, or services are involved," 20 C.F.R. § 404.1568(d)(2)(i)–(iii), while also explaining "[a] complete similarity of all three factors is not necessary for transferability," *id.* § 404.1568(d)(3). Nothing in the regulations requires overlap of codes; the codes are just one of several ways to search for related jobs, and the information conveyed by the codes is just some information to consider. Conway's argument essentially asks the Court to reweigh the evidence by comparing the evidence used by the vocational expert against the

---

[7]POMS contains "publicly available operating instructions for processing Social Security claims." *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385 (2003). POMS does not have the force of law but may be considered persuasive. *Stroup v. Barnhart*, 327 F.3d 1258, 1262 (11th Cir. 2003).

evidence underlying the codes and determining which is weightier, something this Court may not do under the limited standard of review.

Based on this or similar rationale, courts universally have rejected this type of no-code-overlap argument. *See, e.g., Solomon*, 376 F. Supp. 3d at 1018; *Spain v. Soc. Sec. Admin.*, No. CV 21-2367, 2023 WL 1786722, at *4 (E.D. La. Jan. 18, 2023), *report and recommendation adopted*, No. CV 21-2367, 2023 WL 1779186 (E.D. La. Feb. 6, 2023); *Jones v. Comm'r of Soc. Sec.*, No. 8:19-cv-2962-T-30JSS, 2020 WL 8083592, at *6 (M.D. Fla. Dec. 21, 2020), *report and recommendation adopted*, No. 8:19-cv-2962-T-30JSS, 2021 WL 62487 (M.D. Fla. Jan. 7, 2021); *Paul R. v. Comm'r of Soc. Sec.*, No. C19-1243 RSM, 2020 WL 777298, at *2 (W.D. Wash. Feb. 18, 2020); *Bird v. Berryhill*, No. CV 17-1785-CJB, 2019 WL 1568519, at *12 (D. Del. Apr. 10, 2019); *Russell v. Berryhill*, No. 17-CV-00065-SVK, 2017 WL 4472630, at *11 (N.D. Cal. Oct. 6, 2017); *Engel v. Colvin*, No. SACV 14-01989-JEM, 2015 WL 6453081, at *5 (C.D. Cal. Oct. 23, 2015), *judgment entered*, No. SACV 14-01989-JEM, 2015 WL 6453082 (C.D. Cal. Oct. 23, 2015).

Conway argues, "Other than being occupations related to medical services, there was no evidence that these occupations involved any of the same tools, processes, tasks, or work settings as [her] past relevant work." Doc. 11 at 13. The vocational expert testified that the occupations would require "little, if any," adjustment, Tr. 276–78, and Conway does not challenge the vocational expert's expertise or otherwise show the testimony is not substantial evidence. As the regulations require, Conway's skills are transferable if the nurse consultant job is so similar to the general duty nurse job that she would need to make very little, if any, vocation adjustment in terms of "tools, work

17

processes, work settings, *or* the industry." *See* 20 C.F.R. § 404.1568(d)(4) (quoted; emphasis added).

Conway seems to suggest the vocational expert's testimony is unreliable because she responded to multiple interrogatories after the hearing and "was approached on 3 separate occasions … to ensure the ALJ received adequate support for her denial." Doc. 11 at 13–14. Conway does not show the ALJ ultimately relied on inadequate testimony. The weight to give the vocational expert's testimony was a matter for the ALJ.

Conway complains the ALJ "failed to resolve" an inconsistency between the vocational expert's hearing testimony and later interrogatory answers; specifically, in the first interrogatory, the vocational expert relied on a position Conway had never held. Doc. 11 at 14–15. The inconsistency matters naught because the vocational expert relied on the correct positions in the final interrogatory.[8] *See* Tr. 270–79. The ALJ explicitly relied on the vocational expert's testimony based on a hypothetical involving an individual with "the same … past relevant work" as Conway. Tr. 23–24. Conway fails to show the

---

[8]*See* Tr. 277 (vocational expert's answers to interrogatories opining that Conway acquired these skills from her nursing positions: active listening; social perceptiveness; service orientation; critical thinking; coordination; reading comprehension; judgment and decision making; monitoring; writing; active learning; complex problem solving; instructing; learning strategies; time management; assisting and caring for others; documenting and recording information; getting information; processing information; making decisions and problem solving; monitoring process, materials, or surroundings; interpreting meaning of information for others; and processing information); *id.* at 277–78 (vocational expert's answers to interrogatories opining that the skills that transfer to the nurse consultant job are knowledge of general nursing procedures and requirements, service orientation, coordination, reading comprehension, judgment and decision making, writing, complex problem solving, instructing, learning strategies, and monitoring process, materials, or surroundings).

ALJ was required to acknowledge an error that the vocational expert corrected and that did not affect the determination.

Conway argues the vocational expert's "testimony regarding transferable skills was far too general to be considered adequate support for the ALJ's conclusions" because the "skills assessment did nothing to show that [she] had developed skills from an 'art, science or trade' that she could transfer to other substantially similar work." Doc. 11 at 15–16. To the contrary, the ALJ summarized the vocational expert's testimony describing the skills Conway had acquired, and the ALJ's decision makes clear the ALJ credited and relied on the vocational expert's testimony. That testimony is substantial evidence.

In short, reversal on the ground the ALJ failed to apply the correct legal standards in finding transferability of skills is unwarranted.

## B.   *Twisting Limitation*

Conway argues reversal is required because the ALJ failed to evaluate a functional limitation on twisting. Doc. 11 at 17–22.

A claimant is disabled if she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

An ALJ must consider all relevant record evidence. 20 C.F.R. §§ 404.1520(a)(3), 404.1520b. But "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the court] to

conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (cleaned up).

Conway argues, "The record here established that [she] was prohibited from twisting by various physicians, but the ALJ failed to either adopt that limitation or explain why she excluded it from the RFC finding."[9, 10] Doc. 11 at 17. Conway's argument for reversal on this ground is unpersuasive. The ALJ was not required to address every piece of evidence, and her decision is not "a broad rejection" that is insufficient for the Court to conclude she considered Conway's "medical condition as a whole." *See Dyer*, 395 F.3d at 1211 (quoted).

Conway acknowledges her medical provider opined her twisting limitation was temporary but argues the limitation "was supported by medical opinions that covered at least a 12-month period."[11] Doc. 11 at 20. But the author of most of those opinions (Dr. Molloy) stated Conway could return to

---

[9]Conway describes the requirements for evaluating the persuasiveness of a medical opinion. Doc. 11 at 17–18. Because she does not challenge the ALJ's evaluation of the persuasiveness any medical opinion, analyzing those requirements is unnecessary. To the extent she argues the ALJ should have explained why she included no twisting limitation even though she found persuasive the opinions indicating Conway has difficulty twisting, the ALJ was not required to discuss every piece of evidence.

[10]The Acting Commissioner also argues Conway "never even alleged she had any limitations with twisting," Doc. 14 at 12, and cites *Duffy v. Comm'r of Soc. Sec.*, 736 F. App'x 834, 837–38 (11th Cir. 2018). In *Duffy*, the Eleventh Circuit observed that an ALJ has "no duty to consider" an impairment "not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." *Id.* (internal quotation marks and quoted authority omitted). The Acting Commissioner does not address whether a limitation stemming from another impairment must be specifically alleged. Because Conway fails to show error related to twisting, the Court need not consider whether twisting is a separate impairment from the alleged spinal issues or whether Conway was required to specifically allege it.

[11]Conway cites the definition of disability, Doc. 11 at 20 (citing 42 U.S.C. § 423(d)(1)(A)), and appears to conflate limitations and impairments. In any event, she fails to explain how a twisting limitation is an impairment preventing her from engaging in substantial gainful activity.

work with no restrictions by March 25, 2019—eight months after the alleged onset date. *See* Tr. 385. Moreover, the record shows Conway engaged in activities involving twisting after her alleged onset date. *See* Tr. 37–41, 221, 737, 748, 750, 784, 799; *see also* Doc. 14 at 12 ("For example, in April 2019, [Conway] reported she had done "a lot of dog training over the weekend with lots of crouching/bending/twisting" (Tr. 784). While [she] stated her discomfort increased, she reported her pain was only a 3/10 despite engaging in "a lot" of twisting (Tr. 784). Likewise, despite the fact that [she] stated at times that she avoided driving because it required twisting (Tr. 215), she frequently admitted to driving, boating, and traveling …. In fact, during her administrative hearing, [she] never even alleged she had any limitations with twisting[.]").

Conway argues the failure to include a twisting limitation in the hypothetical the ALJ presented to the vocational expert renders the vocational expert's testimony unreliable. Doc. 11 at 21. Because the ALJ was not required to include a twisting limitation, this argument is unpersuasive.

In short, reversal on the ground the ALJ failed to evaluate a twisting limitation is unwarranted.

## C.   *ALJ and Appeals Council's Authority*

Finally, Conway argues reversal is required because the ALJ and the Appeals Council members involved in her case were not properly appointed by Acting Commissioner of Social Security Nancy Berryhill. Doc. 11 at 22–24.

Background pertinent to Conway's argument is summarized as follows:

> Berryhill sought to ensure that SSA's ALJs were properly appointed in light of the Supreme Court's decision in *Lucia v. SEC*, …, 138 S. Ct. 2044, which held that ALJs are inferior officers of the United

States and must be appointed through one of the methods prescribed by the Appointments Clause. That clause enables Congress to vest the appointment of inferior officers "in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Before *Lucia*, SSA ALJs were "selected by lower level staff rather than appointed by the head of the agency." *Carr v. Saul*, …, 141 S. Ct. 1352, 1357 (2021). So the constitutionality of the ALJs' appointments depended on whether Berryhill was properly serving as Acting SSA Commissioner when she ratified them.

Berryhill served as SSA's Deputy Commissioner for Operations (DCO) prior to President Trump's inauguration in January 2017. In December 2016, President Obama issued a memorandum establishing an order of succession for SSA. The order directed the DCO to serve as the Acting Commissioner in the event that the offices of Commissioner and Deputy Commissioner became simultaneously vacant. *See* Memorandum of December 23, 2016, Providing an Order of Succession Within the Social Security Administration, 51 Fed. Reg. 96,337 (Dec. 30, 2016). Those offices became simultaneously vacant on the day of President Trump's inauguration in January 2017, so Berryhill began serving as Acting Commissioner in accordance with the order-of-succession memorandum.

In March 2018, the Government Accountability Office reported that Berryhill's continued service as Acting Commissioner violated the time limitations on acting service imposed by the Federal Vacancies Reform Act of 1998, 5 U.S.C. § 3345 *et seq.* As relevant here, that Act provides that an acting officer may serve "(1) for no longer than 210 days beginning on the date the vacancy occurs; or (2) ... once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate." *Id.* § 3346(a)(1)–(2). Subsection 3346(a)(1)'s 210-day period is extended to 300 days when the vacancy occurs at the beginning of a presidential transition. *Id.* § 3349a(b). Because no nomination for the office had yet been submitted, Berryhill could not legally serve as Acting Commissioner after November 16, 2017—*i.e.*, 300 days after her service began. Shortly after the GAO issued its report, Berryhill stepped down as Acting Commissioner and returned to her role as Deputy Commissioner for Operations.

In April 2018, President Trump nominated Andrew Saul to be the Commissioner of Social Security. After Saul's nomination was submitted to the Senate, Berryhill returned to the role of Acting Commissioner. *See id.* § 3346(a)(2) (allowing acting service "from the date of such nomination for the period that the nomination is pending

in the Senate"). It was during this second period of acting service, in July 2018, that Berryhill purported to ratify the appointments of SSA's ALJs. *See Carr*, 141 S. Ct. at 1357.

*Rush v. Kijakazi*, 65 F.4th 114, 117–18 (4th Cir. 2023) (some internal citations omitted).

Based on these background facts, Conway argues Berryhill served beyond the statutory limit under the Federal Vacancies Reform Act and "purported to properly appoint [the] SSA's ALJs and Appeals Council judges" when "she no longer had any legal authority … to make such appointments." Doc. 11 at 23. Conway continues, "No acting or permanent Commissioner of SSA, nor any other government official with authority, since that time has ever claimed to have properly appointed [the] SSA's ALJs and Appeals Council judges. Accordingly, none of these adjudicators were ever properly appointed by an official with any valid legal authority to do so." *Id.* at 23.

Conway offers no grounds of her own to support her argument; rather, she relies on two cases from the District of Minnesota: *Brian T.D. v. Kijakazi*, 580 F. Supp. 3d 615 (D. Minn. 2022), and *Richard J.M. v. Kijakazi*, No. 19-827, 2022 WL 959914 (D. Minn. Mar. 30, 2022). *See* Doc. 11 at 24 ("This issue is discussed at length in *Brian T.D.* … and *Richard J.M.* …. [Conway] offers the exact same arguments here as the claimants in those cases.").

No court has agreed with the District of Minnesota, more than a dozen district courts have disagreed, *see* Doc. 14 at 23 & n.5, and since Conway filed her brief, the Eighth Circuit has reversed one of the District of Minnesota cases, *see Dahle v. Kijakazi*, 62 F.4th 424 (8th Cir. 2023), and the Fourth Circuit has agreed with the Eighth Circuit, *see Rush v. Kijakazi*, 65 F.4th 114 (4th Cir. 2023).

The Fourth Circuit provides this thorough analysis of the issue, repeated here verbatim in the interest of judicial economy:

The Federal Vacancies Reform Act governs the conditions under which acting officers may "temporarily carry out the duties of a vacant PAS office"—*i.e.*, an office "requiring Presidential appointment and Senate confirmation." *NLRB v. SW Gen. Inc.*, 580 U.S. 288, 292–93 (2017). Section 3345 of the Act dictates who may serve as an acting officer. It provides that in the event of a vacancy, the "functions and duties of the office" may temporarily be performed by (1) the "first assistant to the office," or, if the President "direct[s]," (2) another principal officer of the United States, or (3) another officer or employee of the agency, subject to additional conditions. 5 U.S.C. § 3345(a)(1)–(3). An acting officer under § 3345 serves "temporarily in an acting capacity subject to the time limitations of section 3346." *Id.*

Th[e] [issue] concerns the proper interpretation of § 3346. It reads, in relevant part:

(a) Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office—

(1) for no longer than 210 days beginning on the date the vacancy occurs; or

(2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

*Id.* § 3346(a). Subsection (b) is of limited relevance here. It provides for additional periods during which an acting officer "may continue to serve" after a nomination for the office is rejected, withdrawn, or returned to the President. *Id.* § 3346(b).

Appellants argue that a person may serve under § 3346(a)(2) while a nomination is pending only if the nomination occurred while that person was serving the initial 210-day period authorized by § 3346(a)(1). … They assert that § 3346(a)(2) is exclusively a tolling provision that extends the period authorized by § 3346(a)(1) and cannot be utilized after that period has run. In their view, because Berryhill's initial period

24

of service under § 3346(a)(1) expired before any nomination was sent to the Senate, she was precluded from later serving under § 3346(a)(2) even after Andrew Saul was nominated in April 2018.

We review this issue of statutory interpretation de novo … and reject appellants' view. Subsections 3346(a)(1) and 3346(a)(2) by their plain text authorize independent periods of acting service.

…

The Federal Vacancies Reform Act sets forth two independent periods. As quoted above, the first period starts the day the vacancy begins and ends 210 days later. The second period likewise has a beginning and ending date. The period commences when a nomination is sent to the Senate and terminates when the nomination for whatever reason is no longer pending. Each period, in other words, stands on its own. Appellants contend that an individual is disqualified from the second period of service if the nomination was submitted after the first period had expired. One would expect a disqualification of such magnitude to be explicitly set forth. Nowhere in the statute, however, is any such disqualification to be found. Appellants leave us to divine through mere inference the disqualifying language that they wish Congress had adopted.

We are not persuaded. Our interpretive inquiry, as is often the case, is answered by the ordinary meaning of the statute's text. *See Niz-Chavez v. Garland*, —— U.S. ——, 141 S. Ct. 1474, 1480 (2021). Subsections 3346(a)(1) and 3346(a)(2) are joined by the word "or." The "ordinary use" of the word "or" "is almost always disjunctive, that is, the words it connects are to 'be given separate meanings.'" *United States v. Woods*, 571 U.S. 31 (2013) (*quoting Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)). So when two provisions are joined by an "or," each provision should typically be accorded its "independent and ordinary significance." *Reiter*, 442 U.S. at 338–39. "Congress' use of the word 'or' makes plain that" each provision "was not intended to modify" the other. *Id.* at 339. In other words, the "disjunctive 'or' usually … separates words or phrases in the alternate relationship, indicating that either of the separated words or phrases may be employed without the other." 1A Norman Singer & Shambie Singer, Sutherland Statutes and Statutory Construction § 21:14 (7th ed. 2022).

The statute at issue here authorizes an acting officer to serve under § 3346(a)(1) for up to 210 days beginning when the vacancy occurs or under § 3346(a)(2) while a nomination is pending in the Senate. 5 U.S.C. § 3346(a). The word "or" signals that we should give § 3346(a)(2)

its "independent and ordinary significance," not read it "to modify" § 3346(a)(1). *Reiter*, 442 U.S. at 338–39. So the most natural interpretation of (a)(2) is that it authorizes an independent period of acting service while a nomination is pending regardless of whether the nomination occurred during the (a)(1) period. In line with this interpretation, (a)(2) delineates its own beginning and ending independent of (a)(1)—authorizing acting service "from the date of such nomination" until the nomination is no longer "pending in the Senate." 5 U.S.C. § 3346(a)(2). Appellants' interpretation of (a)(2) as exclusively a tolling provision subordinate to (a)(1) thus deprives (a)(2) of its independent and ordinary significance and contravenes the most natural reading of the statute's disjunctive "or."

Moreover, "[t]he word 'or' has an inclusive sense (A or B, or both) as well as an exclusive one (A or B, not both)," and is "generally used in the inclusive sense." *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015) (*citing, inter alia*, Garner's Dictionary of Legal Usage 639 (3d ed. 2011)). When a waiter offers a patron "coffee or dessert," an ordinary English speaker understands that he can have both coffee and dessert if he so chooses. Without compelling context to the contrary, an acting officer may serve under § 3346(a)(1), § 3346(a)(2), or both. In fact, appellants themselves do not advocate reading the "or" here as exclusive: They accept that an acting officer may serve under both (a)(1) and (a)(2) if a nomination occurs during the (a)(1) period. Berryhill's prior service under § 3346(a)(1) therefore did not preclude her from serving under § 3346(a)(2).

Appellants' many arguments fail to dislodge the one two-letter word "or." Their interpretation of § 3346 is further undermined by the lack of textual support for the significant proviso that they would read into the statute. While the statute provides that an acting officer may serve for an initial 210-day period or while a nomination is pending, appellants read the statute to say that an acting officer may serve for an initial 210-day period or while a nomination is pending if and only if the nomination occurs during the initial 210 days. But, as noted, the statute does not say that. Nothing in the statute's text conditions the availability of a period of service under § 3346(a)(2) on that period beginning during the 210 days described in § 3346(a)(1). No statutory text indicates that the sole function of (a)(2) is to toll (a)(1)'s time limitation.

In fact, the language of § 3346(a)(2) varies meaningfully from other statutory provisions that require a continuous period of service or function solely to toll another time limitation. And "[w]here Congress includes particular language in one section of a statute but omits it in

26

another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quotation marks omitted and alterations adopted).

Most notably, § 3346(b)(1) of the same statute states that if a first nomination for the office is rejected, withdrawn, or returned, "the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return." 5 U.S.C. § 3346(b)(1) (emphasis added). The words "may continue to serve" indicate that a period of service under § 3346(b)(1) following the termination of a first nomination must be continuous with the period of service under § 3346(a)(2) that occurred while the nomination was pending. But crucially, Congress did not use the phrase "may continue to serve" in § 3346(a)(2). Instead, § 3346(a)(2) provides for an independent period of service that is linked to (a)(1)'s 210-day period only with the disjunctive "or." While appellants read § 3346(a)(2) as though it says that an acting officer "may continue to serve" after (a)(1)'s initial 210-day period once a nomination is submitted, that is not the language Congress chose.

Other provisions of the FVRA operate to extend § 3346(a)(1)'s 210-day period using the language "shall be deemed"; the absence of such language from § 3346(a)(2) indicates that (a)(2) is an independent period of authorized acting service, not just a tolling provision. Subsection 3349a(b) provides that if a vacancy occurs during a presidential transition, § 3346(a)(1)'s 210-day period "*shall be deemed* to begin on the later of" either 90 days after Inauguration Day or 90 days after the vacancy occurred. 5 U.S.C. § 3349a(b) (emphasis added). Subsection 3348(c) extends § 3346(a)(1)'s 210-day period by providing that when the period ends on a day that the Senate is in recess, "the second day the Senate is next in session and receiving nominations *shall be deemed* to be the last day of such period." *Id.* § 3348(c) (emphasis added). Appellants read § 3346(a)(2) as though it says that (a)(1)'s 210-day period "shall be deemed" to continue during the pendency of a nomination. But that, once again, is not the language Congress chose.

Finally, Congress knows how to create a tolling provision expressly; the absence of such language from § 3346(a)(2) indicates that it does not function solely to toll (a)(1)'s time limitation. Congress regularly states that a limitations period "shall be tolled" while other proceedings are pending. *See, e.g.*, 28 U.S.C. § 1367(d); 29 U.S.C. § 1854(f). Other times, Congress states that a time period "shall not be counted toward" a statute's time limitation, *see, e.g.*, 28 U.S.C. § 2244(d)(2), or that a time limitation "shall not run" under certain

circumstances, *see, e.g.*, 38 U.S.C. § 3103(b)(1). Appellants read § 3346(a)(2) as though it says that (a)(1)'s 210-day period "shall be tolled" or "shall not run" while a nomination is pending, or that the period that a nomination is pending "shall not be counted toward" (a)(1)'s limitation. Such language would make more plausible appellants' view that no service under (a)(2) is allowed if the (a)(1) period expires before any nomination occurs. But—to make the point once more—that is not the language Congress chose.

Congress thus had many ways it could have conditioned the availability of § 3346(a)(2)'s period of acting service on a nomination occurring during § 3346(a)(1)'s initial 210 days. Congress used none of them. It instead signaled the independence of the two time periods with the simple disjunctive "or."

…

Appellants' contrary arguments are thin reeds that cannot support their highly inferential interpretation of § 3346(a).

First, appellants argue that § 3346(a)'s use of the present tense— "the person serving as an acting officer as described under section 3345 may serve ..."—means that an acting officer must be "serving" under § 3346(a)(1) at the time she begins serving under § 3346(a)(2). 5 U.S.C. § 3346(a). In short, she can only serve under (a)(2) if the nomination occurs while she is "serving" under (a)(1). But as the Eighth Circuit has recognized, given the statute's structure, this interpretation of "serving" yields absurd results:

> "[S]erving" appears in the text of section a, [and] therefore it should apply equally to subsections 1 and 2. If an individual must be "serving" to qualify to serve under subsection 2, then it would follow that an individual must be "serving" to qualify to serve under subsection 1. *That would require an individual be properly serving as an acting officer before their 210-day period under § 3346(a)(1) begins, an impossibility.*

*Dahle v. Kijakazi*, 62 F.4th 424, 428 (8th Cir. 2023) (emphasis added).

If the word "serving" created a requirement that the acting officer already be serving before she serves under § 3346(a)(1) or § 3346(a)(2), how could anyone ever serve "as described under section 3345"? 5 U.S.C. § 3346(a). Subsection 3345(a) enables the President to designate another principal officer or certain agency officers and employees to serve as an

acting officer "subject to the time limitations of section 3346." *Id.* § 3345(a)(2)–(3). But such a designee would never already be "serving" as the acting officer "on the date the vacancy occurs." *Id.* § 3346(a)(1). Appellants' interpretation of § 3346(a) would therefore render nugatory the provisions of § 3345 that authorize the President to designate acting officers. And it "is a cardinal principle of statutory construction" that statutes ought to be construed such that "no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quotation marks omitted).

It is far more likely that the language of § 3346(a)— "the person serving as an acting officer as described under section 3345"—functions to specify that § 3346's time limitations apply to acting officers whose authority derives from 5 U.S.C. § 3345 rather than some other statute. As the government points out, the qualification "serving ... under section 3345" is necessary because there are other office-specific statutes that provide alternative means for filling vacancies. *See, e.g.*, 42 U.S.C. § 902(b)(4). Subsection 3346(a) limits the applicability of its time limitations to officers "serving ... under section 3345." As the Eighth Circuit put it, "[s]ection 3346 does not grant the power to serve, but places time restrictions on service under § 3345." *Dahle*, 62 F.4th at 428.

Second, appellants cite 5 U.S.C. § 3348(b), which states that "[u]nless an officer or employee is performing the functions and duties [of a vacant office] in accordance with sections 3345, 3346, and 3347 ... the office shall remain vacant." Appellants argue that the language "shall remain vacant" means that if an acting officer's service under § 3346(a)(1) ends before a nomination is submitted, the office must remain vacant even after a nomination is made. But if § 3346 allows discontinuous periods of service under subsections (a)(1) and (a)(2)—as we have explained it does—then § 3348(b) does not apply: The office need not "remain vacant" while an acting officer is "performing ... in accordance with sections 3345, 3346, and 3347." 5 U.S.C. § 3348(b). Appellants read § 3348(b) as though it says "if an officer ever ceases to perform in accordance with sections 3345, 3346, and 3347, the office shall remain vacant henceforth." But that, of course, is not remotely what Congress said.

Third, appellants' reliance on *NLRB v. SW General, Inc.* for the proposition that § 3346(a)(2) is solely a tolling provision is unavailing. Section 3346 was not at issue in *SW General*; the case concerned § 3345(b)'s restrictions on acting service by nominees. 580 U.S. at 299. In a brief overview of the [Federal Vacancies Reform Act], the Court noted in passing that the Act contains a "tolling period while a nomination is pending" and *"[i]n most cases*, the statute permits acting

service for 210 days beginning on the date the vacancy occurs" but "tolls that time limit while a nomination is pending." *Id*. at 295–96 (emphasis added and quotation marks omitted). But these statements are fully consistent with § 3346(a) allowing two independent periods of acting service. When a nomination occurs during the initial 210-day period, the nomination does toll (a)(1)'s time limitation. The *SW General* Court expressly caveated that its description applied in most cases. Nothing in *SW General* forecloses the possibility that in addition to operating as a tolling provision, § 3346(a)(2) allows another independent period of acting service if a nomination is submitted after (a)(1)'s 210-day period.

Appellants also raise arguments based on the overall function of the [Federal Vacancies Reform Act] and separation-of-powers concerns. But these considerations support our interpretation of § 3346(a)(2) as authorizing an independent period of acting service.

Appellants assert that their interpretation incentivizes the President to make nominations during § 3346(a)(1)'s initial 210-day period. But the statute as the government interprets it—limiting pre-nomination acting service to 210 days but allowing acting service once a nomination is submitted—makes perfect sense. Subsection 3346(a)(1) encourages the President to make a timely nomination so that the office does not become vacant after 210 days. Subsection (a)(2) encourages the Senate to act promptly on that nomination so that the President's designated acting officer does not serve for an unduly lengthy period while the nomination is pending. The provisions operate in tandem. Appellants' reading of the statute would shift the balance against the President. It would prevent him from designating anyone to serve as an acting officer if he submits a nomination after the 210-day period has elapsed, thus leaving the office vacant for as long as the Senate takes to consider it. For in appellants' view, § 3346(a)(2) is "nothing more than a tolling provision" and is rendered inoperative when the period to be tolled has expired. We will not depart from the clear text of § 3346(a) to alter the incentive structure Congress created.

Appellants also insist that their interpretation would help maintain a proper balance of power between the President and Congress by preventing the executive from using acting officers indefinitely. But adopting their view would in fact raise significant separation-of-powers concerns given its tenuous, highly inferential connection to the statutory text. The ability to control agencies by appointing their heads is a core component of the executive power vested in the President. "[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws."

*Seila Law LLC v. CFPB*, —— U.S. ——, 140 S. Ct. 2183, 2197 (2020) (quoting 1 Annals of Cong. 463 (1789) (James Madison)).

While Congress has directed how the President may temporarily fill vacant offices since President Washington's first term, *see SW Gen.*, 580 U.S. at 294, this court cannot impose additional constraints on the President's appointment of acting officers without a clear congressional command, lest we infringe on the executive prerogative. Appellants would have this court prevent the President from appointing a temporary acting officer under § 3346(a)(2) and hold the position vacant until the Senate acts on a nomination—even if, as here, the President has made the entirely reasonable choice to appoint someone who already served as the acting officer under § 3346(a)(1), and an acting officer is urgently required in order to appoint the agency's ALJs.

Finally, we note that given the Eighth Circuit's decision in *Dahle*, appellants are urging us to create a circuit conflict. While courts are willing to create circuit conflicts when convinced that another circuit erred, there is a strong interest in inter-circuit uniformity on questions of federal law like this one. This is a matter of the federal government's internal organization: whether the acting head of a federal agency charged with executing the law across the nation was validly serving under the FVRA. A circuit split here would result in SSA ALJ decisions being valid in the Eighth Circuit while decisions from the same time period are declared invalid in the Fourth Circuit. Given this interest in uniformity and our own view of the merits, we will not depart from the Eighth Circuit and the growing number of district courts that have rejected appellants' view.

At the end of the day, this case concerns a simple yet important question of statutory interpretation. Did Congress, in enacting 5 U.S.C. § 3346(a), create by implication an unwritten condition that acting service during a pending nomination is allowed only if the nomination occurred during § 3346(a)(1)'s initial 210-day period? Or did Congress mean what it said when it stated simply that an acting officer may serve during the initial 210-day period or while a nomination is pending?

While appellants' historical arguments about the Appointments Clause might be important originalist evidence if this appeal presented a constitutional question, this case is about the correct interpretation of the Federal Vacancies Reform Act—and Congress must be free to write and amend statutes to conform to present-day conditions. When it comes to that question, we think the statutory text is clear: An acting officer may serve while a nomination is pending in accordance with § 3346(a)(2) regardless of whether her service under § 3346(a)(1) expired before the

nomination was submitted. Berryhill therefore was properly serving as SSA Acting Commissioner when she ratified the ALJs' appointments.

*Rush*, 65 F. 4th 118–24 (some internal citations omitted).

Based on this persuasive reasoning, Conway's argument fails. Berryhill was properly serving as Acting Commissioner while Saul's nomination was pending, and she thus properly affirmed and ratified SSA ALJs and Appeals Council members during that time.

In the interest of judicial economy, this Court need not address other arguments of the Acting Commissioner, including an argument that the legislative history of the Federal Vacancy Reform Act supports the statutory interpretation stated above and an argument that Conway would not be entitled to remand even if Berryhill had not been properly serving as Acting Commissioner when she affirmed and ratified the SSA ALJs and Appeals Council members. *See* Doc. 14 at 18–33.

In short, reversal on the ground the ALJ and the Appeals Council members were not properly appointed is unwarranted.

## V.    Recommendation

Because substantial evidence supports the findings, the ALJ applied the correct legal standards, and the ALJ and Appeals Council had authority to decide the case, the undersigned recommends **affirming** the Acting Commissioner's decision and **directing** the clerk to enter judgment for the Acting Commissioner and against Kristin Laurel Conway and close the file.

## VI.    Deadline for Objections and Responses to Objections

"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections[.]" Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections alters review by the district judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1.

**Entered** in Jacksonville, Florida, on July 31, 2023.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:    The Honorable Marcia Morales Howard
      Counsel of record